UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JULIA GRANT,

    *Plaintiff*,

v.

CSL BEHRING, LLC,

    *Defendant*.

Civil Action No. 1:21-cv-02044 (CJN)

## MEMORANDUM OPINION

In March 2021, biopharmaceutical company CSL Behring, LLC terminated the employment of Julia Grant, who then initiated this lawsuit for discrimination and retaliation under the D.C. Human Rights Act. CSL has moved for summary judgment on all claims, arguing that Grant's termination was not motivated by unlawful discrimination or retaliation, but by a company reorganization. Grant maintains that this stated reason is pretextual. For the reasons explained below, the Court grants summary judgment to CSL on Grant's retaliation claim, but denies summary judgment on her age and sex discrimination claims.

### I.   Background

CSL is a biopharmaceutical company that "researches, develops, manufactures, and markets plasma protein biotherapies . . . used to treat serious and rare medical conditions."[1] Def.'s Statement of Facts ("Def.'s SOMF") ¶ 1, ECF No. 24. On May 1, 2017, CSL hired Grant as Director of U.S. Healthcare Policy and Federal Affairs (or more simply, "Director of Federal

---

[1] Unless otherwise noted, these facts are undisputed or established by uncontroverted evidence, at least at the summary judgment stage.

1

Government Affairs"). *Id.* ¶ 2. Grant remained in that position throughout the entirety of her employment with the company. *Id.* ¶ 3. Her job duties included "forging relationships" in Washington, D.C., "to help advance CSL's position in policy" on matters that concerned the company, like patient access or new biopharmaceutical products. Def.'s Ex. C (Wixted Corp. Tr.) at 28; *see* Def.'s SOMF ¶ 18 (describing Grant's role as "focusing on the legislative process and driving advocacy initiatives within Congress").

Grant's direct supervisor during the entirety of her employment at CSL was Patrick Collins, whose title was Senior Director of Global Healthcare Policy and External Affairs. Def.'s SOMF ¶ 6. Michael Ruggiero joined the company in June 2019 as the Senior Vice President of Global Healthcare Policy and External Affairs; among other things, Ruggiero was Collins's superior. *Id.* ¶ 7; Def.'s Ex. C (Wixted Corp. Tr.) at 23. Ruggiero was tasked with "review[ing] the organization and prepar[ing] it for the future." Def.'s Ex. F (Ruggiero Tr.) at 46–47. In other words, he assessed the structure of the organization and considered how to improve it. *See id.* at 45. Although the global government affairs function of CSL also had teams covering policy matters in other parts of the world, the reorganization as relevant here concerned only the group focused on North American affairs.

As it stood when Ruggiero joined, the North America government affairs group consisted of six employees subordinate to him. Collins (again, Senior Director of Global Healthcare Policy and External Affairs) reported to Ruggiero and supervised both Grant (again, Director of Federal Government Affairs) and Karla White (Director of State Government Affairs). *See* Def.'s Ex. G (Org. Charts) at 3361. White had three direct reports, and Grant had none. Pl.'s Statement of Facts ("Pl.'s SOMF") ¶¶ 59–60, ECF No. 25; Def.'s Resp. to Pl.'s SOMF ("Def.'s Resp.")

¶¶ 59–60, ECF No. 26-2.  Grant's office was located in Washington, D.C., while Collins was based in Pennsylvania.  Pl.'s SOMF ¶ 4.

### A.  Restructuring of the North America Government Affairs Group

The Parties dispute how best to characterize the effect of Ruggiero's reorganization.  What is clear is that Ruggiero added an Executive Director-level position to lead the North America group (called the "Head of North America Healthcare Policy & External Affairs"), who would supervise a Senior Director of Federal Affairs and the existing Director of State Government Affairs.  Def.'s SOMF ¶ 13; *see* Def.'s Ex. G (Org. Charts) at 3366.  The Senior Director of Federal Affairs would have no direct reports, and the Director of State Government Affairs would have three.  *See* Def.'s Ex. G (Org. Charts) at 3366.  And key to this lawsuit, there would no longer be a *Director* of Federal Affairs—the position held by Grant.  *See id.*; Def.'s SOMF ¶ 16.

According to CSL, pairing the new Executive Director with a *Senior* Director instead of a Director focused on federal affairs within the North America group would involve "sacrific[ing] the tactical execution of congressional strategy performed by a Director level role," but the Senior Director would have the benefit of "a deep understanding of CSL's business" when developing policy strategy.  Def.'s SOMF ¶¶ 15–18.  Outside consultants could fill the gap left by the loss of a Director-level role by executing the more "tactical elements" of advocacy work.  *Id.* ¶¶ 16–17.

After Ruggiero first proposed a restructuring in approximately April 2020, he went on to produce multiple iterations of the reorganization plan over the course of the next several months.  *Id.* ¶ 22; Def.'s Ex. E (CSL Interrog. Resps.) ¶ 8; *see* Pl.'s Ex. 1 (Wixted Corp. Tr.) at 225–28.  One aspect of the initial plan, which lasted through many iterations, was to eliminate *both* Grant's Director role *and* Collins's Senior Director role, but then fill the position of Senior Director of Federal Affairs with a new hire.  *See* Def.'s Ex. G (Org. Charts) at 3362, 3364; Pl.'s Ex. 1 (Wixted

3

Corp. Tr.) at 148–49.  Having experienced a successful virtual working environment during the COVID-19 pandemic, however, CSL later decided that Collins could fill the Senior Director position—which was supposed to be based in Washington, D.C.—from his location in Pennsylvania.  Def.'s SOMF ¶ 29.  Ruggiero revised the plan to retain Collins in the Senior Director role, but the plan still involved terminating Grant.  *Id.* ¶¶ 33–34.  Ruggiero selected Mary-Lacey Reuther to fill the Executive Director role.  *Id.* ¶¶ 35–36.

The way Grant sees it, the reorganization did not involve the creation of any new roles, but merely their renaming, as duties were shifted among members of the team.  In Grant's view, Reuther was placed in Collins's position; Collins was placed in Grant's position; and Grant was terminated.  *See* Pl.'s Resp. to Def.'s SOMF ("Pl.'s Resp.") ¶¶ 13, 33–35, ECF No. 25.

**B.   CSL Investigation**

In early October 2020, Collins forwarded an email exchange to Grant and the Nickles Group, a political consulting firm, regarding the possibility of having then-First Lady Melania Trump donate convalescent plasma following her recovery from COVID-19 to publicly promote plasma donation.  Def.'s SOMF ¶¶ 38–39; Def.'s Ex. B (Grant Tr.) at 69, 106; *see* Pl.'s SOMF ¶ 18.  Grant replied to Collins and Ruggiero asking why she was not included in the original discussion about the idea.  Def.'s SOMF ¶ 40.  After receiving Grant's reply, Collins called her and advised her to recall the email, but Grant informed Collins that she did not know how to recall emails and that she was "tired" of "being marginalized, cut out, [and] not included" by Collins and Ruggiero.  Def.'s Ex. B (Grant Tr.) at 110; Pl.'s Ex. 4 (Collins Tr.) at 93–97.  Grant also told Collins that she was "not afraid" of him and Ruggiero.  Def.'s SOMF ¶ 41; Def.'s Ex. B (Grant Tr.) at 110–11.  Collins understood from the exchange that Grant was raising a concern about CSL's treatment of women.  Def.'s SOMF ¶ 42.

When Collins told Ruggiero about the comment and about his plans to contact Human Resources, Ruggiero disagreed that CSL mistreated women but agreed that Collins should contact HR. Pl.'s Ex. 4 (Collins Tr.) at 51; Pl.'s SOMF ¶ 38. On October 5, Collins called HR Director Elizabeth Wixted, raising a concern about Grant's complaint that she was "being treated differently because she was a woman." Pl.'s SOMF ¶ 19. On a call with Grant the next day, Wixted asked her if she felt like she was not being included because she is female, and Grant responded that she had "no recollection of that comment," that "women are treated fine," and that she had the "entirely opposite experience" at CSL as she had at other companies. Def.'s Ex. I (Audio Tr.) at 3–4. But Grant did confirm that she perceived "a repeated pattern of being excluded from decision making." *Id.* at 3. Wixted followed up with Collins and Ruggiero to ask them about their perspectives and whether it was typical that Grant would be left out of decisions. Pl.'s SOMF ¶ 22.

## C. Grant's Termination

Over five months later, on March 15, 2021, Ruggiero and Wixted called Grant to inform her that her position was being eliminated, and her employment terminated, effective immediately. *Id.* ¶ 41. The Parties agree that the decision to terminate Grant was Ruggiero's; that Grant is the only employee that Ruggiero terminated at CSL; and that Grant's termination was not performance related. *Id.* ¶¶ 39, 42–43; Def.'s Resp. ¶¶ 39, 42–43. Grant claims that CSL gave her job to Collins, "a less well qualified male who is ten years younger" than her. Pl.'s Resp. ¶ 34. At the time of her termination, Grant was 60 years old, and Collins was 50. *See* Def.'s SOMF ¶ 6; Pl.'s SOMF ¶ 57.

## D. Procedural History

Grant filed suit against CSL in D.C. Superior Court a few months after her termination, and CSL removed the case to this Court, invoking the Court's diversity jurisdiction. Notice of

5

Removal, ECF No. 1.  Grant claims that CSL violated the DCHRA by terminating her on account of her sex (Count I), her age (Count II), and her protected activities—responding to the HR inquiry about CSL's treatment of women (Count III).  Compl. ¶¶ 30, 39, 48, 50, ECF No. 1-1.  Following discovery, CSL moved for summary judgment, arguing that Grant's termination was due to the company's reorganization—not Grant's age, sex, or protected conduct.  Def.'s Mot., ECF No. 24.

## II. Legal Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party demonstrates "the absence of a genuine issue of material fact," the nonmoving party must then identify "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quotation omitted).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"—"[t]he mere existence of a scintilla of evidence in support" of the nonmoving party's position will not suffice.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986).

The Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor."  *Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007) (quotation omitted).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quotation omitted).  In the context of discrimination cases, courts exercise "caution" and apply "an added measure of rigor" when ruling on motions for summary judgment, because "employers rarely maintain records directly evidencing discrimination."  *Woodruff*, 482 F.3d at 526 (quotations omitted).

### III. Analysis

**A. Discrimination Claims**

In her first and second causes of action, Grant claims that CSL discriminated against her by terminating her because of her sex and her age. As relevant here, the DCHRA makes it unlawful for an employer to fire an employee "wholly or partially for a discriminatory reason" based upon the employee's sex or age. D.C. Code § 2-1402.11(a)(1). Employment-discrimination claims under the DCHRA are analyzed using "the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases" in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *McFarland v. George Wash. Univ.*, 935 A.2d 337, 346 (D.C. 2007) (quotation omitted). Courts often construe the DCHRA with reference to cases interpreting and applying Title VII. *See Daka, Inc. v. Breiner*, 711 A.2d 86, 92 n.14 (D.C. 1998). *But see Esteños v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886–87 (D.C. 2008) (explaining that the "differences between the federal and D.C. laws . . . can be significant" and that the DCHRA is read liberally).

Under the burden-shifting framework, an aggrieved employee must first show a prima facie case of discrimination. To do so here, "the employee must show that: (1) she belongs to a protected class; (2) she was qualified for the job at which she suffered the prohibited action; (3) the prohibited action occurred despite her employment qualifications; and (4) the prohibited action was based on the protected characteristic." *Johnson v. D.C.*, 225 A.3d 1269, 1280 (D.C. 2020); *see Cain v. Reinoso*, 43 A.3d 302, 306 (D.C. 2012). If she does, the burden then shifts to the employer to "articulate[] a legitimate, nondiscriminatory basis for the employee's termination." *Johnson*, 225 A.3d at 1280 (quotation omitted). If the employer can offer such an explanation, "the burden of production shifts back to the employee to demonstrate that the ostensibly legitimate reason was pretextual." *Id.* at 1281. That burden "merges with the ultimate burden of persuasion

7

on the question of intentional discrimination," so "the employee must show *both* that the reason was false, *and* that discrimination was the real reason." *Id.* (quotations omitted).  The employee may alternatively prevail under the DCHRA "by proving that the employer's action was motivated 'partially' by a discriminatory reason, even if it also was motivated by permissible reasons," so long as she proves that the employer terminated her for a discriminatory reason "in whole or part." *Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008).

CSL does not attempt to challenge (for purposes of its summary judgment motion) Grant's ability to prove a prima facie case of discrimination, but argues that a legitimate, nondiscriminatory reason motivated the termination.  The Court therefore "need not pause to analyze whether she made out a *prima facie* case." *Id.*; *see Ukwuani v. D.C.*, 241 A.3d 529, 542 (D.C. 2020).  And Grant, for her part, does not dispute that CSL has met its burden of articulating a legitimate nondiscriminatory reason.  Pl.'s Opp'n at 27, ECF No. 25; *see Hollins v. Fed. Nat'l Mortg. Ass'n*, 760 A.2d 563, 571 (D.C. 2000) (stating that an "employer can satisfy its burden by producing admissible evidence from which the trier of fact can rationally conclude that the employment action was not motivated by discriminatory animus" (quotation and brackets omitted)).  In particular, as CSL puts it, the company "creat[ed] a new organizational structure and conclud[ed] that Plaintiff's skill set did not align with the open positions in the restructured organization." Def.'s Mem. at 11, ECF No. 24.  "[T]erminating an employee as part of the company's larger reorganization" is a "legitimate, non-discriminatory reason." *Brandli v. Micrus Endovascular Corp.*, 209 F. Supp. 3d 356, 361 (D.D.C. 2016), *aff'd*, 709 F. App'x 7 (D.C. Cir. 2017) (quotation and brackets omitted); *see also Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (describing "the elimination of the position altogether" as one of "the most common lawful reasons" behind termination).

The Court therefore proceeds "to answer the ultimate question"—whether Grant has "presented sufficient evidence for a jury to find" that age or sex discrimination "actually motivated the employer's decision." *Furline*, 953 A.2d at 353 (quotation omitted). The Court generally focuses on whether a jury could infer discrimination from:

(1) the plaintiff's *prima facie* case;

(2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and

(3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Id.* at 353–54 (quotation omitted). As the Court of Appeals has stated, this "boils down to two inquiries: could a reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the jury infer that this pretext shielded discriminatory motives?" *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005).

The Court agrees with Grant that a reasonable jury *could* find CSL's explanation pretextual. In *Murray v. Gilmore*, the Court of Appeals reached the same conclusion when evaluating an employer's explanation that a reduction in force resulted in elimination of the plaintiff's position. *Id.* at 713–14. The plaintiff there had "offer[ed] plentiful evidence from which a jury could conclude that rather than functionally eliminating [her] position," the employer "simply gave the position a new title" and chose another individual to fill it. *Id.* at 714. For instance, a representative of the employer testified at an administrative hearing that the plaintiff's former position and the new position were "functionally equivalent." *Id.* (quotation omitted). The Court of Appeals also noted the similarities between the two positions' job descriptions and the fact that the employer immediately changed another employee's title after the plaintiff was

9

terminated. *Id.* This "easily create[d] a material issue of fact as to whether [the employer's] justification was pretextual." *Id.*

Perhaps to a lesser extent than in *Murray*, some evidence supports Grant's claim that her position was not eliminated, but simply transferred to Collins. To start, Collins himself testified that he was given Grant's job. Pl.'s Ex. 4 (Collins Tr.) at 31; Pl.'s SOMF ¶ 57. Though CSL strenuously objects to the relevance of Collins's view, he not only performed the modified federal affairs role but also supervised Grant when she occupied her previous position, and he would therefore have personal knowledge of the functional similarities between his role and hers. Along similar lines, White (who is also familiar with the workings of other roles within her group) testified: "[W]hen you look at the job descriptions, the . . . federal job was not eliminated. There was still a job focused on federal government affairs and specifically federal government affairs. And that was going to be Patrick[ Collins]'s role moving forward." Pl.'s Ex. 6 (White Tr.) at 122; Pl.'s SOMF ¶ 46. Moreover, organization charts of the North America group preceding and postdating the reorganization are strikingly similar in structure. *See* Def.'s Ex. G (Org. Charts) at 3361, 3366. There remains one head of the group who supervises two subordinates—the first focused on federal government affairs (with no direct reports) and the second focused on state government affairs (with three direct reports).[2] *See id.* This evidence tending to show that Collins was effectively given Grant's job *could* lend to a jury finding that CSL's explanation is pretextual by supporting both Grant's claim that CSL was "making up or lying about" the nature of the

---

[2] In support of her position on the pretext question, Grant also cites her own testimony that CSL "gave [her] job to a 50-year-old man" and various aspects of CSL's testimony, which she argues included "different and conflicting reasons" for her termination. Pl.'s SOMF ¶ 57; Pl.'s Ex. 2 (Grant Tr.) at 12; Pl.'s Opp'n at 28–36. Because the evidence described above is sufficient to create a genuine issue for the jury, the Court does not address whether this additional evidence makes any material contribution.

reorganization and her claim that CSL gave more favorable treatment to a similarly situated employee of a different age and sex.  *See Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).  A jury might discount White's and Collins's testimony and credit Ruggiero's, but the Court cannot conclude on the current record that it would be required to do so.

Although the record would permit a reasonable jury to find CSL's explanation pretextual, that does not automatically mean that a reasonable jury could infer intentional discrimination.  *See Murray*, 406 F.3d at 714; *Reeves*, 530 U.S. at 148; *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (DC. Cir. 1998) (en banc).  But circumstances where the latter conclusion does not follow from the former are relatively rare.  There are two frequently cited examples:  (1) "if the record conclusively revealed some other, nondiscriminatory reason," and (2) "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Reeves*, 530 U.S. at 148; *Aka*, 156 F.3d at 1291; *see Johnson*, 225 A.3d at 1283 n.15.

CSL appears to rely on the second option, arguing that no reasonable jury could conclude that discriminatory reasons motivated Grant's termination.  Its "independent evidence that no discrimination had occurred" is as follows:  Ruggiero *initially* planned to eliminate Collins's position in addition to Grant's, and that plan changed (such that Collins was not terminated) only due to a "last minute" assessment that Collins could perform the Senior Director role out of Pennsylvania instead of Washington, D.C.  Def.'s Mem. at 12–13.  To infer discrimination based on these circumstances, CSL says, a factfinder would have to come to the incredible conclusion that Ruggiero "harbored discriminatory motives against Plaintiff from the outset" and "first proposed eliminating a younger male's position" along with hers "in order to disguise those discriminatory motives."  *Id.* at 13.

11

But a reasonable jury need not make that leap to land on Grant's side. Indeed, a similar argument was made and rejected in *Murray*, where the employer "point[ed] out that he proposed eliminating positions occupied by both men and women" and "argue[d] that a reasonable jury could not infer sex discrimination"; there, the Court of Appeals "doubt[ed] that this could prevent a jury from inferring sex discrimination" as to the plaintiff. 406 F.3d at 716. Adhering to *Murray*, the Court declines to conclude that the proposed elimination of Collins absolutely bars any inference of discrimination here. CSL points to nothing else in the record that would preclude a reasonable jury from finding intentional discrimination. Even assuming that Grant made only a weak showing of pretext, CSL has failed to identify "abundant and uncontroverted" evidence that no discrimination occurred. *Reeves*, 530 U.S. at 148.

**B. Retaliation Claim**

In her third cause of action, Grant claims that she engaged in protected activity "when she responded to human resources' inquiry into the work environment at CSL as it relates to women," and that CSL retaliated against her in violation of the DCHRA by terminating her on account of that protected activity. Compl. ¶ 48; *see* D.C. Code § 2-1402.61(a). The same *McDonnell Douglas* burden-shifting framework applies here, requiring the plaintiff to first make out a prima facie case. The plaintiff must show: "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (quotation omitted). Just as before, if the plaintiff makes out this prima facie case, the burden shifts to the employer to show a legitimate, nonretaliatory reason for its action. *See id.* Once that is done, the burden shifts back to the plaintiff to demonstrate that the proffered nonretaliatory reason is not true. *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231, 235 n.3 (D.C. Cir. 1999). That burden "merges with the

ultimate burden" of showing that "a reasonable jury could infer retaliation from all the evidence." *Id.* (quotation omitted); *Gaujacq*, 601 F.3d at 577 (quotation omitted).

This time, CSL argues that Grant has not established a prima facie case, homing in on the third requirement that Grant show a causal connection between her response to the HR inquiry (the protected activity) and her termination (the adverse action). Def.'s Mem. at 14–15. CSL contends that because Ruggiero planned to eliminate Grant's position as early as April 2020—months *before* the HR inquiry in October 2020—her termination the following March could not possibly have been motivated by retaliatory animus on his part. Agreeing that Ruggiero is fully responsible for her termination, Grant responds that this timing inquiry should focus not on the time that Ruggiero *first* planned to eliminate Grant's position, but the time that he created the *last* version of the reorganization plan (in December 2020)—or, alternatively, the time that "the decision to terminate Grant on March 15, 2021, was made" (in February 2021). Pl.'s Opp'n at 40–41. In Grant's view, Ruggiero's decision to terminate her was made either two or four months *after* her protected activity, not months before. *See Woodruff*, 482 F.3d at 529 (explaining that "[t]emporal proximity can indeed support an inference of causation, but only where the two events are 'very close' in time" (citation and quotation omitted)).

The Court disagrees. As an initial matter, Grant has not offered sufficient evidentiary support for her position that the last iteration of Ruggiero's plan was made in December 2020 or that Ruggiero decided to terminate Grant in February 2021 (and not earlier). Wixted's testimony about what occurred in December, on which Grant relies, reflects that "conversations with legal began around what the potential restructure would look like" then, not that Ruggiero created the last iteration of his plan then. Pl.'s Resp. ¶ 28; Pl.'s Ex. 1 (Wixted Corp. Tr.) at 225–28; *see* Pl.'s Opp'n at 41. As for February 2021, Grant relies on Ruggiero's testimony regarding an email

13

communication in that timeframe between Wixted and him that it "was contemplated at this point that we would be moving forward and eliminating the director of federal government affairs role."[3] Pl.'s Ex. 3 (Ruggiero Tr.) at 194; *see* Pl.'s Opp'n at 41; Pl.'s Resp. ¶ 26.  Ruggiero explained that Wixted was confused about whether the elimination "need[ed] to be addressed through the exceptions process."  Pl.'s Ex. 3 (Ruggiero Tr.) at 194.  Ruggiero clarified to Wixted that the exceptions process did not come into play because this was a headcount-neutral change.  *Id.*  In his deposition, Ruggiero denied that this conversation reflected an "opening to not eliminate Ms. Grant's role."  *Id.*

Nor has Grant shown that these events in December or February—even if they did take place—are material.  She offers no reason to focus on the last version of the reorganization plan rather than earlier versions that similarly involved the elimination of her position, and she makes no contention that Ruggiero ever deviated from his initial decision to terminate her.  Moreover, she has not offered evidence that contradicts CSL's well-supported assertion that Ruggiero decided to eliminate her position in mid-2020, several months before the protected activity in October.  *See* Def.'s Mem. at 15; Def.'s Ex. B (Grant Tr.) at 30 (confirming that she does not have "any basis to dispute that Mr. Ruggiero first put forth a plan back in April of 2020" to eliminate both her and Collins's positions); Def.'s Ex. C (Wixted Corp. Tr.) at 101–03, 124 (stating that CSL "made the decision to eliminate [Grant's] position in . . . June of 2020"); Def.'s Ex. G (Org. Charts).

Finally, Grant has abandoned any argument that the controlling point in time for the causation analysis is March 15, 2021, when Grant was notified of her termination, and that a jury

---

[3] Grant disputes CSL's statement that "Ruggiero received approval to move forward with the global restructuring of the GHPEA organization" around February 2021. Def.'s SOMF ¶ 26; Pl.'s Resp. ¶ 26.  She therefore does not appear to rely on that fact or argue that the date of ultimate approval by CSL is what matters for the causal analysis.

could find a causal connection based on that termination date. In response to CSL's charge that Grant has no evidence of a causal link beyond the "more than five month time gap" between her October 2020 conversation and March 2021 termination, Grant argues only that she "was terminated *2-4 months* after the decision-maker in her termination became aware of [her] complaint," in either December 2020 or February 2021. Def.'s Mem. at 15; Pl.'s Opp'n at 42 (emphasis added). She does not contend that the relevant action occurred in March 2021 or that additional facts could sufficiently support the finding of a causal connection here over a five-month gap. *Compare Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 69–70 (D.C. Cir. 2015) (holding allegations sufficient to survive a motion to dismiss where a "five-month time lag" existed), *with Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (concluding that an interval of two and a half months, without more, did not support an inference of retaliatory motive). Because Grant argues (without adequate record support) that Ruggiero decided to terminate her in December 2020 or February 2021, and fails to refute CSL's argument that his decision actually occurred months *before* her protected activity, she has not met her burden of establishing a prima facie case.

## IV. Conclusion

For these reasons, the Court grants CSL's motion for summary judgment in part as to Grant's retaliation claim (Count III), and denies its motion as to her discrimination claims (Counts I and II). An order will issue contemporaneously with this opinion.

DATE: March 31, 2023

CARL J. NICHOLS
United States District Judge